IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

|  |  |
|---|---|
| DAMARIS A. VÁZQUEZ-PAGÁN, et al., | |
| Plaintiffs, | |
| v. | CIVIL NO.: 12-1972 (MEL) |
| MIGUEL BORGES-RODRÍGUEZ, et al., | |
| Defendants. | |

**OPINION AND ORDER**

## I.   PROCEDURAL HISTORY

On November 30, 2012 Damaris A. Vázquez-Pagán ("Vázquez-Pagán") filed a complaint on her own behalf and on behalf of her minor daughter, K.F.V. ("K.F.V."), (collectively "plaintiffs") pursuant to 42 U.S.C. § 1983 against Miguel Borges-Rodríguez ("Borges-Rodríguez") in his personal capacity and in his official capacity[1] and Elin Cintrón-González[2] ("Cintrón-González") (collectively "defendants") alleging discrimination on the basis of her political affiliation in violation of the First Amendment and a supplemental tort claim pursuant to P.R. Laws Ann. tit. 31, § 5141 ("Article 1802"). ECF No. 1. On February 18, 2014, defendants moved for summary judgment. ECF No. 32. Pending before the court are defendants' motion for summary judgment, plaintiffs' response in opposition, and defendants' reply. ECF Nos. 32; 40;

---

[1] The complaint clarifies that Borges-Rodríguez has been sued in his official capacity "solely for the purposes of prospective injunctive relief." ECF No. 1, ¶ 2.3. The sole injunctive relief which plaintiffs request is for "an appointment to the Jayuya position that went to Arroyo or to a similar position that would reduce her daily commute in a similar manner. . . ." Id. at ¶ 3.25. It is uncontested that Vázquez was eventually awarded the position in question, which she has occupied since August, 2013. In light of that fact, her prayer for injunctive relief is moot and all claims against Borges-Rodríguez in his official capacity are dismissed.

[2] The complaint does not indicate the capacity in which Cintrón-González has been sued. ECF No. 1. Counsel for Cintrón-González have appeared in representation of him in his individual capacity. ECF Nos. 6; 20; 26. However, to the extent, if at all, that any injunctive relief is requested against Cintrón-González in his official capacity, such claim is moot and is dismissed for the reasons discussed above with regard to Borges-Rodríguez.

44. For the following reasons, defendants' motion for summary judgment is granted in part and denied in part.

## II.   UNCONTESTED FACTS

The Puerto Rico Department of Education's (the "Department of Education") internal procedures to select school directors are governed by what are known as circular letters. ECF Nos. 32-1, ¶ 10; 40-1, ¶ 10. Circular Letter 9-2010-2011, dated October 5, 2010, delineates the "Procedure for the Recruitment and Selection of the Directive, Technical, Supervisory and Facilitating Teaching Personnel." Id. Circular Letter 13-2010-2011 states the procedures for the interview, recommendation, and naming of candidates for various positions, one of which is the School Director position. ECF Nos. 32-1, ¶ 11; 40-1, ¶ 11. The procedure first requires the "Secretary of Education, the Regional Director . . . or Associate Secretary, or to whomever it corresponds, [to] request from the Deputy Secretary of Human Resources the Certification of Eligible Candidates to cover the vacant job post, indicating the classification and number of the job post." ECF Nos. 32-1, ¶ 12; 40-1, ¶ 12. The Certification of Eligible Candidates contains a numerical score that considers various objective factors established by the Puerto Rico Department of Education central offices. ECF Nos. 32-1, ¶ 13; 40-1, ¶ 13. According to the procedure, the Deputy Secretary of Human Resources prepares the Certification of Eligible Candidates and sends the same "to whomever it corresponds"—in the present case, Borges-Rodríguez. ECF Nos. 32-1, ¶ 14; 40-1, ¶ 14.

The selection procedure requires the composition of what is known as an Interview Committee, also referred to as an Evaluation Committee. ECF Nos. 32-1, ¶ 15; 40-1, ¶ 15. The Interview Committee formulates the questions that must be made at the interview and determines the strategy to be pursued at the interview. Id. The recommendations from the Interview

Committee are based upon several criteria considered by said committee, which include subjective factors. ECF Nos. 32-1, ¶ 16; 40-1, ¶ 16. For the School Director position, the Interview Committee must be composed of 3 individuals that represent: (1) the Regional Director; (2) a member of the School Council in representation of the parents; and (3) a member of the School Council in representation of the teachers. ECF Nos. 32-1, ¶ 17; 40-1, ¶ 17. Whenever an official from the Evaluation Committee cannot be present to the interview, a duly authorized representative will substitute this official. ECF Nos. 32-1, ¶ 18; 40-1, ¶ 18. A recommendation of candidates to the post is made by the Interview Committee, which can recommend up to 3 candidates to the Secretary of Education for final selection.[3] ECF Nos. 32-1, ¶ 19; 40-1, ¶ 19. The Secretary of Education has the full discretion to adopt or reject the recommendations made by the Interview Committee.[4] ECF Nos. 32-1, ¶ 21; 40-1, ¶ 21. In considering candidates for School Director positions, the Secretary of Education takes into account: (1) the Certification of Eligible Candidates; (2) a list of recommended candidates from the Interview Committee; and (3) any other factors the Secretary of Education values. ECF Nos. 32-1, ¶ 23; 40-1, ¶ 23.

On January 26, 2011, Vázquez-Pagán sent a letter to Borges-Rodríguez, the Regional Director of the Ponce Region of the Department of Education, requesting relocation from the Francisco Pietri ("Francisco Pietri") School located in Adjuntas to the Agustín-Ortiz School in Jayuya ("Agustín-Ortiz"). ECF Nos. 32-1, ¶ 5; 40-1, ¶ 5. Plaintiffs reside in Jayuya and Vázquez-Pagán made the relocation request due to her daughter's cerebral palsy condition; she

---

[3] Circular Letter 9-2010-2011, dated October 5, 2010 provides that the Interview Committee "shall send its recommendations for the final selection to the Secretary of Education." ECF No. 47-6, at 15. It also states that "[w]hen the recommendation of the Interviewing Committee is not made unanimously, any member of the same *may* submit an explanatory note that must reach the Secretary for consideration." Id. (emphasis added).

[4] Circular Letter 9-2010-2011 also states "[t]he Secretary shall select the candidate and will report it to the Assistant Secretariat of Human Resources." ECF No. 47-6, at 16.

wished to be closer to her daughter. ECF Nos. 32-1, ¶ 6; 40-1, ¶ 6. She understood that a vacancy for the School Director position was about to arise. Id. Vázquez-Pagán stated in the letter that she had been requesting to be relocated to Jayuya for the past 8 years, but that said requests were "futile . . . even though she received the highest points during the interview processes." ECF Nos. 32-1, ¶ 7; 40-1, ¶ 7. On December 11, 2011, Vázquez-Pagán met with former Secretary of Education, Eduard Moreno, to discuss her "relocation issue." ECF Nos. 32-1, ¶ 53; 40-1, ¶ 53.

On April 9, 2012, Vázquez-Pagán made a second written request directed to Borges-Rodríguez, again asking for relocation to Agustín-Ortiz because of her daughter's medical condition. ECF Nos. 32-1, ¶ 8; 40-1, ¶ 8. Vázquez-Pagán reiterated that she understood that a vacancy for the School Director position was about to arise. Id. On June 20, 2012, Vázquez-Pagán made a written request pursuant to the Americans with Disabilities Act to former Governor Luis Fortuño to be relocated from Francisco Pietri to Agustín-Ortiz. ECF Nos. 32-1, ¶ 9; 40-1, ¶ 9.

Olga Arroyo-García ("Arroyo-García") held position of the School Director at the San Patricio School in Jayuya, which she had occupied since 2010. ECF Nos. 32-1, ¶ 25; 40-1, ¶ 25. Arroyo-García received a score of 56 on the Certification of Eligible Candidates and Vázquez-Pagán received a score of 52. ECF Nos. 32-1, ¶ 26; 40-1, ¶ 26. Letters dated July 30, 2012 and signed by Borges-Rodríguez were sent to various eligible candidates for the School Director positions at Agustín-Ortiz and the Josefina León Zayas School ("Josefina León Zayas"). ECF Nos. 32-1, ¶ 24; 40-1, ¶ 24. These letters were sent to Vázquez-Pagán and Arroyo-García, among other candidates, and indicated the time and location of the interviews. Id. Vázquez-Pagán and Arroyo-García were summoned for interviews for the School Director position at Agustín-Ortiz to be conducted on August 3, 2012. ECF Nos. 32-1, ¶ 29; 40-1, ¶ 29; ECF No. 47-8.

On August 15, 2012, Vázquez-Pagán challenged the nomination of Arroyo-García to the Review Committee;[5] her challenge was initially denied, on September 11, 2012. ECF Nos. 32-1, ¶ 27; 40-1, ¶ 27. The Review Committee's conclusion was based on the fact that Vázquez-Pagán challenged the placement of Arroyo-García as School Director before Arroyo-García was officially named to the position; the Review Committee found that Vázquez-Pagán should have waited for her appointment to officially occur before challenging the same. ECF Nos. 32-1, ¶ 28; 40-1, ¶ 28. On September 19, 2012, Vázquez-Pagán submitted another challenge to the August 3, 2012 interviews and selection of Arroyo-García. ECF Nos. 32-1, ¶ 29; 40-1, ¶ 29. She based her challenge upon two factors: (1) that the evaluation committee was not duly composed, since the representative for the parents was not an authorized representative; and (2) that the notification of the date of the interview was not made 5 days prior to the date the interviews were held. Id. On December 6, 2012, the Review Committee recommended that the Secretary of Education rescind the appointment of Arroyo-García as the Agustín-Ortiz School Director, agreeing with Vázquez-Pagán's challenge to the appointment. ECF Nos. 32-1, ¶ 30; 40-1, ¶ 30. The Review Committee also stated that Arroyo-García should be removed from the post and reinstalled as School Director at the San Patricio School, where she previously worked. Id. The "Recruitment Unit"[6] at the Department of Education was instructed to reactivate Arroyo-García to the Certification of Eligible Candidates, once she rescinded her position as School Director at Agustín-Ortiz. Id. After that date, the "Recruitment Unit" was required to emit a new Certification of Eligible Candidates to fill the School Director position at Agustín-Ortiz. Id.

---

[5] The parties do not propose facts that define the Review Committee's role, functions, or composition; however, it is clear from the record that the Review Committee is distinct from the Interview Committee. While the uncontested facts refer to this committee as the Review Committee, certified translations in the summary judgment record translate its name in the Spanish language, Comité de Impugnaciones, as the "Impeachment Committee". See e.g., ECF Nos. 47-12; 47-13; 47-22.

[6] The parties do not propose facts that define the Recruitment Unit's role, functions, or composition.

Pursuant to the recommendations in the report, a new Certification of Eligible Candidates was issued on December 7, 2012, certifying the eligible candidates for Agustín-Ortiz and Josefina León Zayas. ECF Nos. 32-1, ¶ 32; 40-1, ¶ 32. The list was the same as the one provided for the August 3, 2012 interview, because the top 20 scores remained the same. Id. Accordingly, letters dated December 7, 2012, signed by Borges-Rodríguez were sent to the individuals designated in the Certification of Eligible Candidates for the School Director positions at Agustín-Ortíz and Josefina Leon Zayas. ECF Nos. 32-1, ¶ 33; 40-1, ¶ 33. These letters were sent to the Vázquez-Pagán and Arroyo-García, among other candidates, and indicated the interviews' times and locations. Id. On December 14, 2012, interviews and evaluations for the School Director position at Agustín-Ortiz were held, which both Arroyo-García and Vázquez-Pagán attended. ECF Nos. 32-1, ¶ 34; 40-1, ¶ 34. Carlos Escobales-Pérez ("Escobales-Pérez") served as the representative for the parents; Edwin Rivera served as the representative for the teachers; and Cintrón-González served as the representative of the Regional Director, Borges-Rodríguez. ECF Nos. 32-1, ¶ 35; 40-1, ¶ 35.

Cintrón-González gave Arroyo-García a score of 100 and Escobales-Pérez and Rivera-Ortíz both gave Arroyo-García a score of 76, giving Arroyo-García a total score of 176 out of 200.[7] ECF Nos. 32-1, ¶ 36; 40-1, ¶ 36. Cintrón-González gave Vázquez-Pagán a score of 98 and Escobales-Pérez and Rivera-Ortíz both gave Vázquez-Pagán a score of 100, giving Vázquez-Pagán a total score of 198 out of 200. ECF Nos. 32-1, ¶ 37; 40-1, ¶ 37. Vázquez-Pagán, Arroyo-García, and Luis Rivera-Rodríguez were recommended to the Secretary of Education. ECF Nos.

---

[7] The "Candidate Evaluation Sheets" completed by the members of the Interview Committee suggests that Cintrón-González's evaluation was worth a maximum of 100 points and Escobales-Pérez's and Rivera Ortiz's evaluations were worth a maximum of 100 points combined, as Cintrón-González signed evaluations worth a total of 100 points individually, while the other two members of the Interview Committee jointly signed a single evaluation worth a total of 100 points. ECF Nos. 47-18; 47-19. The parties have not cited to other evidence within the summary judgment record to clarify how the evaluations of the members of the Interview Committee are weighted.

32-1, ¶ 38; 40-1, ¶ 38. The recommendation sheet left the reasons for recommendation section blank. Id. The recommendation sheet contains the names, signatures, and positions of the members of the Interview Committee, and is also initialed by Borges-Rodríguez. Id. Both the newly emitted Certification of Eligible Candidates and the Evaluation Committee's recommendations were forwarded to the central offices of the Department of Education for the Secretary of Education's evaluation. ECF Nos. 32-1, ¶ 39; 40-1, ¶ 39. On December 14, 2012— the same day the interviews were conducted—Arroyo-García was sent a letter indicating that the Interim Secretary of Education, Nilda Ortíz-Rodríguez, had selected her to occupy the job posting as School Director at Agustín-Ortiz, effective immediately. ECF Nos. 32-1, ¶ 40; 40-1, ¶ 40.

Vázquez-Pagán challenged the results of the December 14, 2012 interviews. ECF Nos. 32-1, ¶ 41; 40-1, ¶ 41. The Review Committee agreed with Vázquez-Pagán's challenge and recommended several courses of action, which were: (a) to rescind Arroyo-García from her position as School Director at Agustín-Ortiz; (b) to place Arroyo-García at her old position as School Director at the San Patricio School; and (c) for the Human Resource Department to emit a Certification of Eligible Candidates in order to fill the School Director position at Agustín-Ortiz with the same candidate list included in the Certification of Eligible Candidates used for the August 3, 2012 interviews. Id. Arroyo-García occupied the School Director position at Agustín-Ortiz between January 2013 and May 2013 and was rescinded from her position at Agustín-Ortiz in May 2013. ECF Nos. 32-1, ¶¶ 42, 43; 40-1, ¶¶ 42, 43.

Vázquez-Pagán has occupied the School Director position at the Agustín-Ortiz since August 2013. ECF Nos. 32-1, ¶¶ 2, 4; 40-1, ¶¶ 2, 4. The Secretary of Education at the time effectively placed her as the School Director at Agustín-Ortiz. ECF Nos. 32-1, ¶ 3; 40-1, ¶ 3.

Prior to occupying the School Director position at Agustín-Ortiz, she was the School Director at the Francisco Pietri School in Adjuntas. ECF Nos. 32-1, ¶ 4; 40-1, ¶ 4. At all times relevant to the facts alleged in the complaint, Vázquez-Pagán has occupied the position of School Director within the Department of Education, albeit at different schools; she did not suffer any salary loss during the relevant time period. Id.

### III.   LEGAL STANDARD

The purpose of summary judgment "is to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required." Wynne v. Tufts Univ. Sch. of Med., 976 F.2d 791, 794 (1st Cir. 1992). Summary judgment is granted when the record shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "'A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party. A fact is material if it has the potential of determining the outcome of the litigation.'" Farmers Ins. Exch. v. RNK, Inc., 632 F.3d 777, 782 (1st Cir. 2011) (quoting Rodríguez-Rivera v. Federico Trilla Reg'l Hosp., 532 F.3d 28, 30 (1st Cir. 2008)).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the movant presents a properly focused motion "averring 'an absence of evidence to support the nonmoving party's case[,]' [t]he burden then shifts to the nonmovant to establish the existence of at least one fact issue which is both 'genuine' and 'material.'" Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990) (quoting Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990)). For issues where the nonmoving party bears the ultimate burden of proof, that party cannot merely "rely on the absence of competent evidence, but must affirmatively point to specific

facts" in the record "that demonstrate the existence of an authentic dispute." McCarthy v. Nw. Airlines, Inc., 56 F.3d 313, 315 (1st Cir. 1995). The plaintiff need not, however, "rely on *uncontradicted* evidence . . . . So long as the plaintiff's evidence is both cognizable and sufficiently strong to support a verdict in her favor, the factfinder must be allowed to determine which version of the facts is most compelling." Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 19 (1st Cir. 2004) (emphasis in original).

In assessing a motion for summary judgment, the court "must view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." Griggs-Ryan, 904 F.2d at 115 (citations omitted). There is "no room for credibility determinations, no room for the measured weighing of conflicting evidence such as the trial process entails, [and] no room for the judge to superimpose his own ideas of probability and likelihood . . . ." Greenburg v. P. R. Mar. Shipping Auth., 835 F.2d 932, 936 (1st Cir. 1987). The court may, however, safely ignore "conclusory allegations, improbable inferences, and unsupported speculation." Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990) (citations omitted).

### IV. LEGAL ANALYSIS

#### A. Standing

A cause of action under § 1983 may be brought by a person "who has suffered the deprivation of constitutional or certain statutory rights by virtue of the conduct of state officials." Anaya Serbia v. Lausell, 646 F.Supp. 1236, 1244 (D.P.R. 1986) (citing Gómez v. Toledo, 446 U.S. 635, 640 (1980)). "It is the settled law of this Circuit that family members do not have standing to sue under § 1983 in their personal capacity." Reyes Vargas v. Rosello González, 135 F.Supp.2d 305, 308 (D.P.R. 2001) (citing Soto v. Flores, 103 F.3d 1056, 1062 (1st Cir. 1997), cert

denied, 522 U.S. 819 (1997)). Family members lack an independent cause of action under § 1983, "unless the constitutionally defective conduct or omission was directed at the family relationship." Caraballo v. Puerto Rico, 990 F. Supp. 2d 165, 177 (D.P.R. 2014) (citations omitted); see also Robles-Vázquez v. García, 110 F.3d 204, 206 n.4 (1st Cir. 1997). Such cases include two categories: (1) substantive due process claims to prevent governmental interference in private decisions, and (2) claims regarding a liberty interested in the rearing of young children. See Reyes Vargas, 135 F.Supp.2d at 308-09 (citing Pittsley v. Walsh, 927 F.2d 3, 8 (1st Cir. 1991); Valdivieso Ortíz v. Burgos, 807 F.2d 6, 8 (1st Cir. 1986)). Private family decisions protected by the right to substantive due process include decisions regarding "whether to procreate, whether to school one's children in religious as well as secular matters, and defining the defining the 'family' with whom one chooses to live." Valdivieso Ortíz, 807 F.2d at 8 (internal citations and quotation marks omitted). With respect to the second category of cases "the Supreme Court has protected the parent only when the government directly acts to sever or otherwise affect his or her legal relationship with the child." Valdivieso Ortíz, 807 F.2d at 8. "State action that affects the parental relationship only incidentally . . . is not sufficient to establish a violation of an identified liberty interest." Reyes Vargas, 135 F.Supp.2d at 309; see also Valdivieso Ortíz, 807 F.2d at 8-9 (internal citations and quotation marks omitted) (holding that stepfather and siblings lacked a cause of action under § 1983 to sue for the deprivation of the companionship because state action in question had only an incidental effect on the familial relationship where their adult son and brother was allegedly beaten by guard and dealt a fatal blow); Berry v. City of Muskogee, 900 F.2d 1489 (10th Cir. 1990) (holding children could not sue pursuant to § 1983 for their grief and loss of companionship based on claim that their father had been deprived of the right to be free from cruel and unusual punishment under the Eighth

Amendment and has been deprived of life without due process of law in violation of the Fourteenth Amendment because "[a]ny damage suffered by the parent's children is merely incidental . . . .").

The complaint alleges that K.F.V. "has also suffered damages from defendants' discriminatory actions, in the form of being deprived of the possibility of having her mother closer to home and thereby able to take better care of her." ECF No. 1, ¶ 3.23. Taking the allegation as true, it is not sufficient to establish that K.F.V. has standing pursuant to § 1983. Plaintiffs do not allege and have not brought any evidence to the court's attention to suggest that defendants have deprived K.F.V. of any constitutional or statutory rights, and the allegations in this case do not involve a protected substantive due process right or conduct directed at the familial relationship between Vázquez-Pagán and K.F.V. Although the summary judgment record indicates that defendants were aware that Vázquez-Pagán sought the School Director position at Agustín-Ortiz in order to be closer to her daughter, any effect on Vázquez-Pagán's relationship with and ability to care for K.F.V. is incidental to the alleged deprivation of the position as a result of political discrimination against her. Therefore, K.F.V. lacks standing to sue under § 1983 for violations of her mother's First Amendment rights and K.F.V.'s first amendment political discrimination claim is dismissed with prejudice.

## B.      First Amendment Political Discrimination[8]

The First Amendment to the United States Constitution embodies the right to be free from political discrimination. Barry v. Moran, 661 F.3d 696, 699 (1st Cir. 2011). The First Circuit Court of Appeals has held that that right prohibits government officials from "taking adverse action against public employees on the basis of political affiliation, unless political

---

[8] In light of the finding that K.F.V. lacks standing to bring a claim of political discrimination pursuant to §1983, the following sections applies only to Vázquez-Pagán's political discrimination claim.

11

loyalty is an appropriate requirement of the employment." Ocasio–Hernández v. Fortuño-Burset, 640 F.3d 1, 11 (1st Cir. 2011) (internal citations omitted). A *prima facie* case of political discrimination based on the First Amendment consists of four elements: "(1) that the plaintiff and defendant have opposing political affiliations, (2) that the defendant is aware of the plaintiff's affiliation, (3) that an adverse employment action occurred, and (4) that political affiliation was a substantial or motivating factor for the adverse employment action." Lamboy–Ortiz v. Ortiz–Vélez, 630 F.3d 228, 239 (1st Cir. 2010). "Once made, the defendant may then rebut that showing with what is commonly referred to as the Mt. Healthy defense: by proving by a preponderance of the evidence that the governmental agency would have taken the same action," regardless of plaintiff's political affiliation. Reyes-Pérez v. State Ins. Fund Corp., 755 F.3d 49, 54 (1st Cir. 2014) (citing Díaz-Bigio v. Santini, 652 F.3d 45, 52 (1st Cir. 2011)).

1. ***Prima Facie* Case**

i. **Opposing Political Affiliations**

In their briefing in support of their motion for summary judgment, defendants do not explicitly contest whether Vázquez-Pagán and defendants have different political affiliations and are silent as to whether plaintiffs can establish this prong of a *prima facie* case. Similarly, Vázquez-Pagán' opposition does not specifically assert that the parties have different political affiliations. The uncontested facts proposed by defendants are silent with regard to defendants' political affiliations, and Vázquez-Pagán does not propose any additional facts regarding the same. In her deposition, Vázquez-Pagán stated: "My whole family belongs to the Popular Democratic Party ("PDP"), we are an activist family." ECF No. 40-2, at 3: ll. 8-9. With regard to Cintrón-González, plaintiffs do submit deposition testimony from Escobales-Pérez,[9] in which

---

[9] Although the proposed uncontested facts do not address this matter, the complaint alleges that "[u]pon learning of Mrs. Arroyo's political maneuverings, Vázquez enlisted the help of Mr. Carlos Escobales, a local community leader

Escobales-Pérez explains that he spoke with Cintrón-González regarding Vázquez-Pagán's request to transfer to Agustín-Ortiz and that Cintrón-González "was not going to name someone from another party." ECF No. 40-1, at 5: ll. 19-20. Although the deposition testimony does not state the political party with which each side is affiliated, taken as true a reasonable inference can be drawn from the statement that Vázquez-Pagán and Cintrón-González have opposing political affiliations. With respect to Borges-Rodríguez, however, Vázquez-Pagán does not cite to any evidence that directly indicates he was not a member of the PDP, or from which a rational inference can otherwise be made that he and Vázquez-Pagán have opposing political affiliations. However, because defendants do not argue that Vázquez-Pagán's claim should be dismissed against Borges-Rodríguez on grounds of failure to meet the first prong of the *prima facie* standard, the court will proceed to analyze the remaining prongs with respect to both defendants.

### ii. Knowledge of Political Affiliation

With regard to knowledge of Vázquez-Pagán's political affiliation, Vázquez-Pagán asserted in her deposition that that she told Cintrón-González she belongs to the PDP:

> Q: Did you ever personally over the phone [*sic*], in person speak to him regarding your political affiliation?
>
> A: No. He knew it through other person and then once asked me, and I told him yes, I am a member of the Popular Democratic Party personally.
>
> Q: Okay so you did personally talk to him regarding your political affiliation?
>
> A: Yes, because he asked me and I told him yes, I belong to the Popular Democratic Party.
>
> Q: Could you please tell me what exactly was spoken between you and Mr. Elin Cintrón-González?

---

and radio personality to inquire about the matter." ECF No. 1, ¶ 3.11. It continues, "Mr. Escobales obtained personal knowledge that co-defendant Cintrón was in charge of receiving 'political recommendations' for personnel transactions within the Department of Education." Id. at ¶ 3.12.

> A: I was interested in transferring districts from Adjuntas to Jayuya. Because I have a daughter with a health condition and I needed to be close to her. I asked Mr. Borges for the transfer and Mr. Borges said yes. He told me that they were going to granted [*sic*] as a reasonable accommodation, but when Mr. Cintrón-González arrived at the educational region as assistant to director, he told Mr. Borges that I belong to the Popular Democratic Party and asked him not to grant me the transfer. That the person recommended for the transfer was Ms. Olga Arroyo-Garcia[,] recommended by Mr. Roberto Pagán.

ECF No. 40-2, at 3-4. With regard to Cintrón-González, taking Vázquez-Pagán's assertion as true for summary judgment purposes, a reasonable inference can be drawn that Cintrón-González knew of her affiliation with the PDP. Additionally, Escobales-Pérez's statement that Cintrón-González told him "that he was not going to name someone from another party" provides additional corroboration suggesting that Cintrón-González knew of Vázquez-Pagán's political affiliation. ECF No. 40-3, at 5:19-20. These statements constitute sufficient evidence to satisfy Vázquez-Pagán's burden with regard to the knowledge element as to Cintrón-González.

With respect to Borges-Rodríguez, the transcript of Vázquez-Pagán's deposition states:

> Q: In verbal conversations, did you ever speak about politics to Miguel Borges-Rodríguez?
>
> A: No.
>
> Q: Did he ever try and find out what your political affiliation was?
>
> A: No.
>
> Q: Did you voluntarily give your political affiliation to Mr. Borges-Rodríguez?
>
> A: No, he knew it through Mr. Elin Cintrón.
>
> Q: And how do you know that he knew it through Elin Cintrón Rodríguez?
>
> A: Because he once told me. He told me that Elin Cintrón had told him that I belong to the Popular Democratic Party.

Q: But Ms. Vázquez-Pagán, prior I asked you whether you spoke about anything having to do with political affiliation and whether you spoke about having anything to do with politics with Mr. Borges-Rodríguez and you answered no.

A: No.

ECF No. 40-2, at 9:6-25. Although the individual deposing Borges-Rodríguez attempts to point out tension or contradictions in Vázquez-Pagán's testimony, such credibility determinations are for the jury to decide. Vázquez-Pagán's assertion that Borges-Rodríguez told her that he learned of her affiliation with the PDP via Cintrón-González, taken as true, is sufficient evidence of Borges-Rodríguez's knowledge of Vázquez-Pagán's political affiliation to satisfy the second prong of the *prima facie* standard with regard to Borges-Rodríguez.

### iii.   Occurrence of an Adverse Employment Action

Defendants assert that Vázquez-Pagán cannot satisfy this prong of a *prima facie* case of political discrimination, arguing that her request was for a purely lateral transfer, and that a transfer or reassignment that does not involve a significant alteration in salary and / or responsibilities does not constitute a materially adverse employment action. ECF Nos. 32, at 10-11. In support of this proposition, they rely primarily on Marrero v. Goya of Puerto Rico, Inc., in which the First Circuit Court of Appeals stated "a transfer or reassignment that involves only minor changes in working conditions normally does not constitute an adverse employment action." 304 F.3d 7, 23 (1st Cir. 2002). Marrero, however, was decided in the context of a claim of retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and thus is not necessarily applicable for determining what constitutes an adverse employment action for the purposes of establishing a *prima facie* case of political discrimination Id. Moreover, the facts of Marrero are distinct from the uncontested facts in the case of caption. Marrero involved an employee who was involuntarily transferred to another department at the

15

company for which she worked, and the transfer did not involve change in her job description or salary. The First Circuit Court of Appeals held that such a transfer did not involve a materially adverse employment action for Title VII retaliation purposes. Id. at 25 ("[T]he sort of 'intensified personal animus, hostility, disrespect, and ostracism' that Marrero alleged here 'fails to constitute a material employment disadvantage' sufficient to transform an ostensibly lateral transfer into an adverse employment action.") (citing Jones v. Fitzgerald, 285 F.3d 705, 714 (8th Cir. 2002)).

In this case, Vázquez-Pagán applied for a position at another school that would not have occasioned a change in title or salary from those associated with the position she held at the time of her application. Vázquez-Pagán desired the position because she found its location to be more convenient, allowing her to be closer to her daughter. Plaintiffs deny defendants' characterization of her efforts to be appointed to the School Director position at Agustín-Ortiz as a "lateral transfer request," labeling it as a failure to hire her to a "specific career position." ECF No. 40, at 3. Regardless of whether the employment action in question is referred to as a denial of a lateral transfer request or as a failure to hire, the First Amendment bars defendants from rejecting Vázquez-Pagán for the position because of her political affiliation. In Rutan v. Republican Party of Illinois the United States Supreme Court held that denial of promotions, transfers, or rehires on the basis of political affiliation violates the First Amendment. 497 U.S. 62 (1990). In doing so, the Supreme Court considered "the shorter commuting hours and lower maintenance expenses incident to transfers to more convenient work locations" as a benefit that could not be denied on the basis of one's political affiliation or support. Id. at 62-63. In reaching this decision, the Supreme Court in no way suggested that in order to constitute an adverse employment action for purposes of First Amendment political discrimination a transfer request had to be akin to a

16

promotion. To the contrary, <u>Rutan</u> identifies requests for transfers as a distinct category from requests for promotions, neither of which may be denied because of a candidate's political affinities. It is uncontested that Vázquez was denied the School Director position at Agustín-Ortiz on September 7, 2012 when the position in question was awarded to Arroyo-García, after interviews for the position that occurred on August 3, 2012, and again on December 14, 2012, when the position was Arroyo-García was again selected for the position after interviews that occurred the same day. Based on these uncontested facts Vázquez-Pagán has met her burden of establishing that she suffered an adverse employment action on each of these two occasions.

### iv.   Political Affiliation as a Substantial or Motivating Factor

In her deposition, Vázquez-Pagán asserts that Cintrón-González asked what political party she belongs to so that he could ask for the recommendation of Roberto Pagán-Gelpí ("Pagán-Gelpí"), who was the candidate for mayor of Jayuya from the New Progressive Party ("NPP"):

> Q: So Ms. Vázquez, you mentioned Mr. Roberto Pagán-Gelpí and you mentioned that Elin Cintrón-González would recommend to Roberto Pagán-Gelpí the candidate. Did Elín Cintrón-González urge you to change your political affiliation in order for him to recommend to Ms. [*sic*] Roberto Pagán-Gelpí you candidacy?
>
> A: Yes, he told me to engage in a dialogue and in exchange for the transfer to affiliate with their party.
>
> Q: And how do you respond?
>
> A: No, I told him that I wouldn't do it, that I had my principles, that  those were the teachings of my parents; that I belong to the Popular Democratic Party and that I wouldn't do it.
> . . .
>
> Q: Did Mr. Elin Cintrón-González tell you that because you would not switch your political affiliation he would not help you in attaining the position of director at Agustín Ortiz School?

> A: He told me that the person who was recommended for that
> position was Ms. Olga Arroyo because she was the electoral
> commissioner for the New Progressive Party.

ECF No. 40-2, at 6-8. The record also contains testimony from Escobales-Pérez, who states that

he spoke with Pagán-Gelpí, who told Escobales-Pérez "that he was the mayoral candidate to the

New Progressive Party and that the persona [*sic*] that was going to be named had to go through

his approval." ECF No. 40-3, at 3:3-5.  According to Escobales-Pérez, Pagán-Gelpí continued:

> [T]he person that had applied for recommendation to be named in
> that position was Ms. Olga Arroyo, who was his electoral
> commissioner, and that it was an arrangement he had with her.
> That he knew before hand [*sic*] the case of Ms. Damaris Vázquez
> because they are cousins, but unfortunately he had a commitment
> with is [*sic*] electoral commissioner and because Damaris was of
> the other party, that he had to see where he was going to lose less,
> naming Damaris or naming his electoral commissioner.

ECF No. 40-3, at 3:5-13. Escobales-Pérez states that on the same day that he spoke with Pagán-

Gelpí, June 12, 2012, he also went to speak with Borges-Rodríguez to ask about Vázquez-Pagán:

> I start to talk to him about Damaris' case and his answer was that he
> met with Damaris and that he had knowledge, a particular
> knowledge of her case and her daughter's case. That she had even
> showed him a photo album of her daughter. That he had agree [*sic*]
> to make a commitment to have her change [*sic*] to Agustín Ortiz
> School, but unfortunately that he has to follow instructions and that
> there was another person already for that position.

Id., at 4:10-13, 7:11-14. Escobales-Pérez continues that "[a]t that same moment Mr. Elin Cintrón

comes into the office," and describes:

> As soon as he walked in the door, he didn't even say hi, he just
> looked at me and he said: "I know what you are doing here; you
> are talking about Damaris' case. I told him yes, that I wanted to
> know and to investigate what was going on in her case. He told me
> in a brazen way that he was not going to name Damaris for that
> position. That he had to name the electoral commissioner for his
> candidate that was doing the political campaign for this candidate.

ECF No. 40-3, at 4:16-24. Escobales-Pérez indicated that Cintrón-González "was very sad, that he knew of [Vázquez-Pagán's] daughter's situation but he was going to name his electoral commissioner, that he was not going to name someone from another party. That over his cadaver he would name Damaris." Id. at 5, ll. 17-20. During his deposition, Escobales-Pérez was also asked: "Did anybody in the committee ever made [sic] political comments or ask questions regarding political affiliations during the evaluation?" Id. at 8, ll. 12-14. He responded:

> Mr. Elin Cintrón did make some comments about the other candidate that had been there that I understood were out of place and I let him know right there. Once the interview was over that the candidate leave [sic], the scores are taken between the thee [sic] people that were there, taking into consideration who was going to be the next director of the school, Damaris on the score is the highest score, she wins the score [sic] and he states: 'Don't dream that she is going to that position because you know who I am going to name to that position.'

Id. at 8:18-24.

The statements described above, taken as true, do evince that Cintrón-González, to the extent he had a role in the appointment process, planned to use his influence as a member of the Interview Committee to appoint Arroyo-García over Vázquez-Pagán. Even assuming for argument's sake that Escobales-Pérez's testimony regarding Pagán-Gelpí's statement is inadmissible hearsay, both Vázquez-Pagán and Escobales-Pérez recall statements made by Cintrón-González indicating that he preferred Arroyo-García for the position over Vázquez-Pagán based on political affiliation and are sufficient evidence of politically discriminatory animus on their own. With regard to Borges-Rodríguez, however, Vázquez-Pagán does not present direct evidence that he possessed political animus toward Vázquez-Pagán, based on her affiliation with the PDP. Instead, she points to Escobales-Pérez's deposition testimony, which indicates that Borges-Rodríguez was present in the room when Cintrón-González "expressed his discriminatory intentions" to Escobales-Pérez. ECF No. 40, at 2 n.1. Vázquez-Pagán argues that

"[n]ot only did Borges fail to intervene with Cintrón's discriminatory actions but he eventually designated the latter as his representative several months later when the position was called before the requisite interview committee." ECF No. 40, at 2 n.1. As Vázquez indicates, a reasonable jury could infer political animus from the evidence that Borges-Rodríguez heard Cintrón-González's statements and later permitted Cintrón-González to serve on the Interview Committee in his place.

Although the summary judgment record contains evidence from which defendants' political animus towards Vázquez-Pagán may rationally be inferred, she is required to show not only that their actions or omissions were based on political animus, but that their actions "were the cause in fact of" her alleged constitutional deprivation. Sullivan v. City of Springfield, 561 F.3d 7, 14 (1st Cir. 2009); see also Gutiérrez–Rodríguez v. Cartagena, 882 F.2d 553, 558 (1st Cir. 1989). Accordingly, "[p]ublic officials may be held liable under § 1983 for a constitutional violation only if a plaintiff can establish that his or her constitutional injury 'resulted from the direct acts or omissions of the official, or from indirect conduct that amounts to condonation or tacit authorization.'" Ocasio-Hernández v. Fortuno-Burset, 640 F.3d 1, 16 (1st Cir. 2011) (quoting García v. Miranda-Marín, 610 F.3d 756, 768 (1st Cir. 2010). "The causal connection alluded to by [§ 1983] 'can be established not only by some kind of [ ] personal participation in the deprivation, but also by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury.'" Sánchez v. Pereira-Castillo, 590 F.3d 31, 50 (1st Cir. 2009) (citing Gutíerrez-Rodríguez, 882 F.2d at 561). In the context of a § 1983 claim for political discrimination in violation of the First Amendment, it is not only the ultimate decision-maker who may be held liable for a particular adverse employment action, but other individuals who share responsibility for the decision. See Ocasio-

Hernández, 640 F.3d at 16-17. Bearing in mind the causation standard under § 1983, whether Vázquez-Pagán has made the requisite *prima facie* showing that political affiliation was a substantial or motivating factor for the denial of the School Director position at Agustín-Ortiz based on the August 3, 2012 interviews and December 14, 2012 interviews will be considered.

### i.      August 3, 2012 Interviews

The summary judgment record does not contain evidence and / or proposed facts regarding the scores given to Vázquez-Pagán or Arroyo-García by the members of the Interview Committee with respect to the August 3, 2012 interviews. Thus, although based on Cintrón-Rodríguez's comments that he intended to name Arroyo-García to the position a rational jury could conclude that he gave Arroyo-García a favorable score on his evaluation, no evidence has been brought to the court's attention regarding the intentions or motivations of the other two members of the Interview Committee with regard to their role in the process. Thus, any inference regarding how the other two members of the Interview Committee voted would based on conjecture.

Even though it lacks evidence regarding how the members of the Interview Committee voted in evaluating the candidates, the evidentiary record does contain a recommended candidates list completed by the Interview Committee based on the interviews conducted on August 3, 2012. ECF No. 47-11. While it is uncontested that the Interview Committee may recommend up to three candidates to the Secretary of Education, the list, which is signed by Cintrón-González as "Educational Region Rep.," only recommends Arroyo-García for the position. Id. at 1. In the "recommended reasons" section, it states: "Olga Arroyo is the person with the best score." Id. Defendants assert "the evaluation committee's report put Arroyo-García as the recommended candidate since she had the highest score in the Certification of Eligible

Candidates. Thus, Arroyo-García was the person brought forth to the Secretary of Education for recommendation as School Director for the Agustín Ortiz School." ECF No. 32-1, at 7. The record cited by the parties, however, does not specify whether Arroyo-García had the best score from the Certification of Eligible Candidates list or based on the scores awarded by the Interview Committee. Indulging reasonable inferences in plaintiffs' favor, a reasonable jury could find that Interview Committee awarded Arroyo-García the "best score" based on their own evaluations, one of which was completed by Cintrón-González—Borges-Rodríguez's representative on the committee.

Even assuming that the "best score" references the score from the Certification of Eligible Candidates, the Interview Committee nonetheless only recommended a single candidate—that is, Arroyo-García. When considering candidates for the position of School Director, "the Secretary of Education takes into account: (1) the Certification of Eligible Candidates; (2) a list of recommended candidates from the Interview Committee; and (3) any other factors the Secretary of Education values." ECF Nos. 32-1, ¶ 23; 40-1, ¶ 23. With respect to the Certification of Eligible Candidates, the summary judgment record does not establish that defendants had a role in compiling it, but nonetheless it is uncontested that it is based on "objective factors established by the Puerto Rico Department of Education central offices." ECF Nos. 32-1, ¶ 13; 40-1, ¶ 13. Thus, the fact that the Secretary of Education considers the Certification of Eligible Candidates list does not implicate Cintrón-Rodríguez in the decision to appoint Arroyo-García. With regard to the list of recommended candidates, however, taking into consideration Cintrón-González's comments indicating that for political reasons he planned to name Arroyo-García to the position rather than Vázquez-Pagán, the fact that Cintrón-González was on the Interview Committee for the August 3, 2012 interviews, that the Interview Committee

22

only recommended Arroyo-García for the position, that the Secretary of Education takes into account the Interview Committee's recommendation, and finally that Arroyo-García was ultimately awarded the position on September 19, 2012, a reasonable jury could find that Cintrón-González's actions caused Arroyo-García to be appointed to the position and "that political affiliation was a substantial or motivating factor in the decisional calculus." Gómez v. Rivera Rodríguez, 344 F.3d 103, 110 (1st Cir. 2003) (citing Mt. Healthy, 429 U.S. at 287). Although gaps in the summary judgment record exist regarding the motivations of the other two members of the Interview Committee in recommending Arroyo-García and the reasons for the Secretary of Education's ultimate decision to appoint Arroyo-García, "[t]he causation question typically is grist for the factfinder's mill." Id. (citations omitted). Based on the totality of the evidence in the record, Vázquez-Pagán has established a *prima facie* case with respect to Cintrón-González as to her claim for failure to appoint her to School Director position at Agustín-Ortiz based on the August 3, 2012 interview process shifting the burden of persuasion to Cintrón-González to establish a Mt. Healthy defense with regard to this decision.

With regard to Borges-Rodríguez, however, the evidence that his own actions or omissions were politically motivated and that his actions or omissions were causally linked to the adverse employment action in question is more tenuous than that which the record contains regarding Cintrón-González's role. Despite the fact that the summary judgment record does not contain direct evidence of Borges-Rodríguez's political animus, as plaintiffs assert Escobales-Pérez's deposition testimony does strongly imply that Borges-Rodríguez was present while Cintrón-González made comments that he would not "name" Vázquez-Pagán to the position because he planned instead to name the electoral commissioner for "his candidate," and establishes that this conversation occurred on June 12, 2012, prior to the August 3, 2012

interviews. Additionally, although Borges-Rodríguez did not sit on the Interview Committee, in a sworn statement made under penalty of perjury, Borges-Rodríguez states:

> Elin Cintrón-González served as special aide of the Ponce Regional Director at both the August 3, 2012 and December 14, 2013 interviews. Accordingly, Elin Cintrón-González served as my subordinate during the interview evaluation, and eventual recommendations made for the Agustin-Ortiz School in said dates. At no time could Cintron-González go beyond my own determinations as Regional Director of Ponce.

ECF No. 47-5, at 4. In view of this statement, a rational jury could infer that Borges-Rodríguez retained some control over the recommendations made by the individual substituting for him as representative of the Ponce Regional Director on the Interview Committee. Considering the evidence that Borges-Rodríguez was aware of Cintrón-González's intentions to appoint Arroyo-García to the position in question based on political reasons, the that fact that Cintrón-González substituted for him as representative of his position as Regional Director of Ponce, and that by his own admission at no point could Cintrón-González "go beyond [Borges-Rodríguez's] own determinations" in making recommendations to the Secretary of Education, a reasonable jury could infer that he gave at least "tacit authorization" to Cintrón-Rodríguez's recommendation, and that political animus was a substantial and motivating factor behind his actions or omissions. As with regard to Cintrón-Rodríguez, Vazquez-Pagán has adduced sufficient evidence to shift the burden of persuasion to Borges-Rodríguez to show that the same action would have been taken regardless of her political affiliation. Thus, Vázquez-Pagán has also satisfied the fourth prong of the *prima facie* standard as to Borges-Rodríguez with respect to the August 3, 2012 interview process.

### ii.     December 14, 2012 Interviews

Defendants point out that Cintrón-González gave Vázquez-Pagán a score of 98 out of 100 based on the Interview Committee's December 14, 2012 interview and argue "[t]his type of

excellent review is hardly the type of 'over-my-dead-body-evaluation' that someone would bestow upon a candidate whom they harbor an acute bias towards." ECF No. 32, at 17. They argue that his evaluation was the only means by which he could have influenced the selection process for the Agustín-Ortíz School Director position, and that if he "did not perform an adverse employment action at the *only* moment that he could have, the Court is simply forced to conclude that he did not have a discriminatory animus against the Plaintiff. Colloquially speaking, it is irrelevant that someone 'said something' regarding an individual's political affiliation or animus if at the moment of truth this individual did not act upon such *mens rea*." ECF No. 32, at 17. Their argument, however, overlooks that fact that although Cintrón-González gave Vázquez-Pagán a score of 98 out of 100, he gave Arroyo-García a score of 100 out of 100.

Regardless of whether an inference can be drawn that Cintrón-González's decision to award Vázquez-Pagán a score of 98 was politically motivated, however, plaintiffs have another problem regarding Cintrón-González's role in the selection of Arroyo-García instead of Vázquez-Pagán based on the interviews conducted on December 14, 2012. It is uncontested that the Certification of Eligible Candidates and the Interview Committee's recommendations were sent to the Secretary of Education; however, the parties have not proposed that the Interview Committee's scores of the candidates were also sent to the Secretary of Education. The selection procedure establishes that the Interview Committee "shall send its recommendations for the final selection to the Secretary of Education," but does not contain a similar requirement regarding the scores from the Interview Committee members. ECF No. 47-6, at 15.

As previously mentioned, the Secretary of Education possesses the authority to select the candidate he or she desired for the Agustín-Ortiz School Director position and takes into account: (1) the Certification of Eligible Candidates; (2) a list of recommended candidates from

the Interview Committee; and (3) any other factors the Secretary of Education values." As with respect to the August 3, 2012 interviews, there is no indication from the summary judgment record that either defendant influenced the decision to hire Arroyo-García based on the Certification of Eligible Candidates. With respect to the list of recommended candidates, however, in contrast to the recommendation made by the Interview Committee based on the August 3, 2012 interviews, the list for the December 14, 2012 interviews states that the recommended candidates are "a) Dámaris Vázquez Pagán"; "b) Olga Arroyo García"; and "c) Luis A. Rivera Rodríguez." Id. The "recommended reasons" section is left entirely blank. Id. Thus, there is no indication from the list of recommended candidates that Cintrón-González, via his participation on the Interview Committee, favored Arroyo-García over Vázquez-Pagán. The record is silent as to whether the order of the recommended candidates on the list is material in terms of how highly the Interview Committee recommended the three recommended candidates relative to one another. However, if such a hierarchy does in fact exist, Vázquez-Pagán's name comes before Arroyo-García's on the list. A review of the list of recommendations made by the Interview Committee (ECF No. 47-20, at 2) reveals that it does not even contain the recommended candidates' aggregate evaluation scores, let alone a list of the scores awarded by each member of the Interview Committee to each recommended candidate. Thus, without any indication to the contrary, no reasonable jury could infer that the Interview Committee recommended Arroyo-García more highly than Vázquez-Pagán to the Secretary of Education based on the list of recommended candidates. While it is possible that the Secretary of Education valued Cintrón-González's evaluation or opinion as representative of the Ponce Regional Director and that Cintrón-González's evaluation or opinion had a causal influence on the Secretary of Education's decision to choose Arroyo-García over Vázquez-Pagán, the parties have

not brought evidence to the court's attention that would establish a causal link between Cintrón-González's acts or omissions and the decision to select Arroyo-García in December, 2012. Any inference regarding the same would be based on conjecture and speculation.

Acknowledging that the record contains substantial evidence which credited as true for summary judgment purposes establishes that Cintrón-González was not "going to name" Vázquez-Pagán to the School Director position for politically motivated reasons, it does not establish that he actually influenced the decision to appoint Arroyo-García instead of Vázquez-Pagán for a second time in December, 2012. The uncontested facts establish that a list of three recommended candidates was transmitted to the Secretary of Education. The list sent regarding the December 14, 2012 interviews, however, would not enable a rational jury to determine that Cintrón-González influenced the Secretary of Education to select Arroyo-García. Thus, with respect to the result of the December 14, 2012 interviews, summary judgment is granted as to Cintrón-González.

With regard to Borges-Rodríguez, Vázquez-Pagán also points to a letter from the Review Committee regarding its evaluation of Vázquez-Pagán's complaint submitted on December 19, 2012. ECF No. 47-22, at 2. The letter states:

> [Arroyo-García] was never ceased between December 6, 2012 and December 14, 2012 (date of issuance of the summons letter and the date of the celebration of the interview for appointment). The inaction of the Ponce Educational Region in ceasing the respondent and reinstalling her into her old position technically remained with the incumbent in the position of School Principal of the Agustín Ortiz School of the Municipality of Jayuya between December 6, 2012 and December 14, 2012, the date in which the interview process was held to cover the position for a second occasion. Such inaction leads the Assistant Secretariat of Human Resources to incur in an error when authorizing to issue a Certification of Eligible Candidates for Principal of the Agustín Ortiz Rivera School of the Municipality of Jayuya without being available or without incumbent. The error was greater from the

> Ponce Educational Region when, [*sic*] knowingly, performed an interview process and recommendation of candidates for the Secretary of Education to appoint a candidate in a position that is not vacant. However, the Ponce Educational Region generated a report of Appointment and Change (Report 409) in favor of the respondent, Mrs. Olga Arroyo García, performing an appointment from the position of School Principal of the Agustín Ortiz School at the same Agustín Ortiz School with the effective date of December 14, 2012.

ECF No. 47-22, at 5-6. Vázquez-Pagán asserts that this portion of the Review Committee's decision "constitutes **direct evidence** of political discrimination, i.e., the proverbial 'smoking gun.'" ECF No. 40, at 3 (emphasis in original). The excerpt, however, contains no indication that the fact that Arroyo-García remained as School Director between December 6, 2012 and December 14, 2012 was politically motivated. Taking the Review Committee's determination that there was "inaction" on the part of the Ponce Educational Region in removing Arroyo-García as true, the excerpt does not establish the reason for such inaction, and plaintiffs have not cited to any additional evidence to shed light on why she was not removed from the position during that eight-day period. Furthermore, there is no evidence that the failure to vacate Arroyo-García from the position prior to the second interview process bore any relation to the decision to re-appoint Arroyo-García instead of Vázquez-Pagán based on the interviews conducted on December 14, 2012. Based on the summary judgment record, a finding that Borges-Rodríguez caused Arroyo-García to be chosen for the position on that date for politically-motivated reasons would require speculation. Although Borges-Rodríguez's initials are contained on the sheet listing the three recommended candidates, as previously discussed that sheet lists both Vázquez-Pagán's and Arroyo-García's names. The fact that it contains Borges-Rodríguez's initials would not enable a rational jury to determine that he had a causal role in the decision to appoint Arroyo-García instead of Vázquez-Pagán. Because plaintiffs have not presented evidence from which a reasonable jury could find that Borges-Rodríguez's actions or

28

omissions contributed to her being denied the Agustín-Ortiz position based on the December 14, 2012 interview, defendants' motion for summary judgment is granted with respect to Borges-Rodríguez as to that claim.[10]

## 2.    Mt. Healthy Defense

Defendants assert a Mt. Healthy Defense stating "[a]s per [the] Certification of Eligible Candidates Arroyo-Garcia has a score of 56 while Plaintiff had a score of 52."[11] ECF No. 32, at 20 (emphasis omitted). They continue, "[a]ccordingly, as per *one* of the metrics considered by the Secretary of Education in nominating a School Director, Arroyo-Garcia scored *higher* than Plaintiff." ECF No. 32, at 20 (emphasis in original). As defendants themselves admit, this is only one factor taken into account by the Secretary of Education in selecting a School Director. The fact that Arroyo-García had a better score than plaintiff with respect to one criterion considered by the Secretary of Education does not establish by a preponderance of evidence that the Secretary of Education would have selected Arroyo-García after the August 3, 2012 regardless of Vázquez-Pagán's political affiliation. Defendants do not point to any evidence that the Secretary of Education based the decision solely on the scores from the Certification of Eligible Candidates. As defendants state "the evidentiary record does not contain specifics about *what*

---

[10] Additionally, while the parties spend a considerable portion of their briefing regarding defendants' motion for summary judgment on the failure to appoint Vázquez-Pagán to the School Director position at Agustín-Ortiz for a second time, on December 14, 2012, the complaint in this case was filed on November 30, 2012, and does not include allegations related to the second interview process or failure to grant her the position for a second time. <u>See</u> ECF No. 1. A review of the record reveals that the complaint was never amended to add allegations regarding the December 14, 2012 interviews, and that plaintiffs did not request leave to do so at any point. Therefore, although plaintiffs include the failure to appoint Vázquez-Pagán to the School Director position at Agustín-Ortiz on December 14, 2012 in the Proposed Pretrial Order as part of their factual contentions in support of this case, defendants move to dismiss allegations related to the failure to appoint her on December 14, 2012, and Vázquez-Pagán makes arguments regarding the same in their opposition to defendants' motion to summary judgment, she has not actually raised a claim regarding the failure to hire her to the position in question on December 14, 2012. Thus, in addition to the merit-based reasons for granting defendants' motion for summary judgment regarding the December, 2012 interview process, Vázquez-Pagán's claim regarding the result of the December 14, 2012 interviews is barred from proceeding to trial based on the failure to include such allegations in the complaint.
[11] The remainder of defendants' arguments in favor of a <u>Mt. Healthy</u> defense pertain to the December 14, 2012 interview, about which, as discussed above, Vázquez-Pagán has not established a *prima facie* case of discrimination, or even included allegations in the complaint.

exactly was considered by the Secretary of Education . . . .” in selecting Arroyo-García. ECF No. 32, at 21. Additionally, it contains limited evidence regarding the Interview Committee's decision to recommend only Arroyo-García to the Secretary of Education based on the August 3, 2012 interviews. While in light of these gaps in the summary judgment record it is possible the same decision would have been made regardless of Vázquez-Pagán's political affiliation, defendants have not brought adequate proof to the court's attention to sustain that contention by a preponderance of the evidence. Merely showing that based on one criterion Arroyo-García had a higher score than Vázquez-Pagán is not sufficient to establish a <u>Mt. Healthy</u> defense. Therefore, in light of the fact that Vázquez-Pagán has met her burden of establishing a *prima facie* case of political discrimination, defendant's motion for summary judgment is denied with regard to the August 3, 2012 interview process.

## C.    Supplemental Claim

Plaintiffs base their Article 1802 claim upon the same allegations which underlie their § 1983 political discrimination claim. <u>See</u> ECF No. 1. Article 1802, Puerto Rico's general tort statute, provides that a person who “causes damages to another through fault or negligence” shall be liable in damages. P.R. Laws Ann. tit. 31 § 5141. “[T]he Puerto Rico Supreme Court has clarified that ‘[a]s a general rule, in the face of conduct by an employer that has been typified and penalized by a specific labor legislation, the employee *only* has recourse to the relief of said Act, and is barred from seeking additional compensation under [Article 1802].’” <u>Irizarry-Santiago v. Essilor Indus.</u>, 982 F. Supp. 2d 131, 140 (D.P.R. 2013) (citing <u>Santini Rivera v. Serv. Air, Inc.</u>, 137 D.P.R. 1, 16 (1994)) (emphasis added). Puerto Rico Law 100 of 1959 (“Law 100”), as amended by P.R. Laws Ann. tit. 29, § 146, *et seq.*, seeks to prevent discrimination in the workplace based on numerous protected classifications, including political affiliation. <u>See</u>

P.R. Laws Ann. tit. 29, § 146. Because Law 100 specifically protects employees against political discrimination in the workplace and Vázquez has not identified any tortious conduct that is unrelated to her claim of political discrimination, Vázquez is barred from relief pursuant to Article 1802 in this case. Therefore, Vázquez's Article 1802 claim is dismissed with prejudice.

With regard to K.F.V., "[a] relative can recover under Article 1802 in a separate cause of action" from a discrimination claim brought under Law 100. Baralt v. Nationwide Mut. Ins. Co., 183 F. Supp. 2d 486, 488 (D.P.R. 2002). "The tort claim of the relatives is dependent on the successful prosecution of a Law 100 claim." Id.; see also Reyes Guadalupe v. Casas Criollas, 597 F.Supp.2d 255 (D.P.R. 2008) ("[T]he Article 1802 claim is 'derivative' of the discriminated-against individual's Law 100 claim and can only stand if a claim for discrimination has been made out under Law 100."); and Olivieri v. Abbot Laboratories, Civ. No. 05-1244 (ADC), 2008 WL 747082, at *16 (D.P.R. March 19, 2008); Domínguez v. Eli Lilly and Co., 958 F.Supp. 721, 745 (D.P.R. 1997). In this case, however, Vázquez-Pagán has not pursued a discrimination claim pursuant to Law 100 and no evidence has been brought to the court's attention that she has prevailed on such a claim in the past. Therefore, K.F.V.'s derivative Article 1802 claim cannot prevail and is dismissed without prejudice.

## V.   CONCLUSION

Based on the foregoing analysis, defendants' motion for summary judgment is granted in part and denied in part, as follows. All claims against defendants in their official capacities are dismissed with prejudice. K.F.V.'s § 1983 political discrimination claim against all defendants is dismissed with prejudice. Vázquez-Pagán's § 1983 political discrimination claim survives as to both defendants with respect to the alleged failure to appoint her to the School Director position at Agustín-Ortiz based on the August 3, 2012 interview process and is dismissed as to both

defendants with regard to the December 14, 2012 interview process. Plaintiffs' Article 1802 claims are dismissed with prejudice.

IT IS SO ORDERED

In San Juan, Puerto Rico, this 23rd day of September, 2014.

s/Marcos E. López
U.S. Magistrate Judge